NOT DESIGNATED FOR PUBLICATION

No. 113,469

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ROGER D. TUCKER,
*Appellant*.


MEMORANDUM OPINION


Appeal from Sedgwick District Court; DAVID L. DAHL, judge. Opinion filed July 15, 2016.
Appeal dismissed.


*Samuel Schirer*, of Kansas Appellate Defender Office, for appellant.


*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*,
attorney general, for appellee.


Before MCANANY, P.J., HILL and BRUNS, JJ.


*Per Curiam*:  Roger D. Tucker appealed his theft conviction and the resulting
sentence. After he filed his notice of appeal, the State notified this court that Tucker died.
Initially, we agree with the State that Tucker's appeal is moot because even if it we found
in his favor, the appropriate remedy would be a new trial—not exoneration. In addition,
we do not find that resolution of the issue presented in this case would serve the interests
of public policy. Moreover, even if we considered the merits of Tucker's appeal, he
would not be entitled to relief. Thus, we dismiss this appeal.


1

On March 24, 2014, the State charged Tucker with felony theft. An affidavit submitted by law enforcement alleged that in February 2014, Tucker walked into a JC Penney's in Wichita, removed a pair of new shoes from a box, put on the new shoes, placed the shoes he was wearing in the box, and returned the box to the shelf. The affidavit further alleged that Tucker placed another pair of new shoes in a shopping bag and left the store without paying for either pair of new shoes.

The affidavit also claimed that a store security guard stopped Tucker—who had two prior theft convictions—outside the store and escorted him back into the store. Although Tucker did not have a receipt, he allegedly told the security guard that he had previously purchased the new shoes and was returning them to the store. A short time later, a law enforcement officer arrived at the store, took tucker's statement, and placed him under arrest.

Subsequently, the district court appointed an attorney to represent Tucker, released him on bond, and ordered him to appear for a preliminary hearing. Evidently, Tucker objected to his first attorney's representation, so the district court appointed Bradley Sylvester from the Sedgwick County Conflicts Office to represent him.

Tucker forfeited his bond when he failed to appear at his preliminary hearing. Accordingly, the district court issued a bench warrant for his arrest. Tucker was arrested in early June 2014, and the district court conducted a preliminary hearing on July 8, 2014. Before the State presented its evidence, Tucker advised the district court that he had filed a disciplinary complaint against the prosecutor. The prosecutor denied knowledge of the existence of any disciplinary complaint and argued that Tucker did not have the authority to direct who prosecuted him.

Throughout the preliminary hearing, Tucker interrupted the district judge and the attorneys and refused to use his attorney to voice his arguments. At one point, the district judge warned Tucker that if he did not cease interrupting, he would have him removed from the courtroom. The district court ultimately overruled Tucker's motion to disqualify the prosecutor and took judicial notice of Tucker's two prior theft convictions.

As the State began presenting its evidence, Tucker told the district court that he had a conflict with his attorney. He alleged that Sylvester had told him that he would not be pushed around like an attorney who had represented Tucker in a previous case. According to Tucker, Sylvester refused to listen to his version of the events and refused to communicate with him. In response, the district court paused the proceedings to inquire into Tucker's assertions.

Sylvester explained to the district court what he had said to Tucker:

"[The attorney who previously represented Tucker] was in the same office I was at the time and it was a very stressful situation for her. In fact, I think personally it's part of the reason why she went into private practice and why she got off the appointment list.

"Last time this case was up for preliminary hearing I was unable to do it, I can't remember why, but I said can somebody cover this for me. Nobody in my office would cover it because nobody would deal with Mr. Tucker because a lot of people in my office have.

"So what I just told him is he's telling me stuff, for example, the whole litany we've had about this accepting prior convictions, taking judicial notice, I've told him I think the Judge is right, I think he's right, there still is this barrage of he disagrees with me, he's telling me all this stuff.

"We have met. This is a shoplifting case, I am years beyond needing to understand how to do a shoplifting case. I mean, what I mean by that is I've met with

3

him, we've talked. There is what's supposed to be a video. I found out today there's not a video, so I'm going to be cross-examining this witness. I am happy to represent Mr. Tucker, because I will be happy to deal with what I consider difficult clients. Mr. Tucker has been a difficult client today. The record can show he has talked incessantly. And I deal with clients like that and they do not push me around.

"THE DEFENDANT:  Yeah.

"MR. SYLVESTER:  So I will represent him and I will do everything I can for him. And if he doesn't realize that, I don't know what to tell ya, because sometimes clients don't. So I am here and I'll represent him. This is going into a store and taking shoes. And he's talked to me about what he did in the store. If he wants some more time to talk and that will cure the problem, great.

"If he says he and I have some sort of irreconcilable differences and he can't ever trust me or can't do anything, he can raise that issue and try to go pro se or get different counsel, but I am not backing off the statement that I made to him, with the explanation I've given the Court. And I represent every client to the fullest, to my best of my ability."

The district court then asked Tucker if he wanted time to work out his issues with Sylvester. In response, Tucker said he did not think he could repair their relationship. He further claimed that Sylvester failed to notify him of the hearing date, which resulted in his arrest. The State argued that based on Sylvester's appointment date, he could not be blamed for Tucker's arrest.

The district court then denied Tucker's motion for a new attorney, stating that he had not established justifiable dissatisfaction with Sylvester. Specifically, it found that Sylvester and Tucker had not suffered a complete breakdown in communication, that there was not an irreconcilable conflict between the two, and that Sylvester did not have a conflict of interest. Thereafter, the store security guard testified about the events on March 24, 2014, and the district court found probable cause to bind Tucker over for trial.

4

At a hearing on a motion for bond reduction held 3 days after the preliminary hearing, Sylvester told the court that he thought he and Tucker were "getting along quite well." Sylvester explained that Tucker did not trust any defense counsel or prosecutor to do the right thing. However, Sylvester indicated that "he and I are seeing probably better eye to eye than most of his other attorneys."

Over the following months, Tucker filed several pro se motions. One of which was a combined motion to dismiss and motion to substitute counsel that was filed about 2 weeks before the scheduled trial date. Tucker alleged in his motion that Sylvester had failed to help him discover exculpatory evidence and refused to file his pro se motions. At a motions hearing held on October 24, 2012, Tucker alleged that Sylvester had requested continuances without his permission, had lied to him about documents he possessed, and had refused to support his theory of defense. Tucker also claimed that Sylvester was "in bed with the district attorney" and that his relationship with Sylvester had ceased to exist.

When the district court asked Sylvester to respond, he explained that he investigated Tucker's claims but determined that they had no merit. Sylvester also stated that when he continued the case, he explained to Tucker that it was necessary because of his heavy caseload. Sylvester stated that he had made sure that he had obtained all the available discovery in the case and had provided Tucker with copies. However, considering the nature of the case, Sylvester pointed out that there was not much in the way of discovery.

Sylvester summarized his feelings about the case as follows:

"So I'm not objecting at all to the Court making a finding he needs a new attorney. He can battle this issue out with a new attorney if he wants to. Maybe it's like having a doctor and a fresh look will help him out. At the conflict office we're supposed

5

to be the gatekeepers, and I don't say this on many cases, and just suck it up and deal with clients that have issues like this. He needs to understand if he does that, the speedy trial issues, if that's the catchall, because he objects I can't continue his case, this coming Monday I'm having to continue a Jessica's Law case because his case got bumped over. If Mr. Tucker thinks the way to do that is to put the two defendants in a courtroom and whoever wins the fight goes to trial, great. That's the only way I can think of doing it other than the attorney with his schedule saying this when I'm going to try it.

"I'm just flabbergasted that he's still saying I violated every right in the book. I don't think from what he stated he should get a new attorney, but I think he believes wholeheartedly what he's saying and that makes him so angry we're never going to be able to talk again. I'll represent him at trial."

After confirming with Sylvester that he was prepared to effectively represent Tucker at trial—which was scheduled to begin in 3 days—and after hearing arguments from the State, the district court denied Tucker's motion. In doing so, the district court found that although Tucker indicated that he was dissatisfied with Sylvester, none of his justifications were sufficient to require the appointment of new counsel. It indicated that it was very familiar with Sylvester because he practiced before the court on a regular basis, and that Sylvester was "more than competent." The district court also pointed out that Sylvester was not required to adopt every pro se motion Tucker filed because he had a professional responsibility not to make frivolous arguments. The district court noted that the case involved a "fairly low-level offense" with only a few witnesses and limited evidence. As such, it found that Sylvester's representation would not prejudice Tucker's rights.

Immediately thereafter, Tucker unequivocally invoked his Sixth Amendment right to self-representation. The district court then continued the hearing to consider his request. Three days later on October 27, 2014, Tucker reasserted his desire to represent himself, even after the district court explained to Tucker the risks and difficulties in

representing himself. Thus, the district court granted Tucker's request and appointed Sylvester to serve as standby counsel.

The following month, the district court conducted an 8-day jury trial. The jury found Tucker guilty of theft, and the district court sentenced Tucker to serve 12 months' imprisonment. Thereafter, Tucker filed a timely appeal.

While the appeal was pending, the State notified this court that Tucker had died on April 29, 2015. Shortly thereafter, the State filed a motion for involuntary dismissal of the appeal on the ground of mootness. After Tucker's appellate counsel filed a response asserting that the appeal was not moot, the State's motion was denied so that the parties could brief the issue of mootness.

ANALYSIS

At the outset, we will address the State's contention that Tucker's death moots his appeal. As a general rule, a court does not decide moot questions or render advisory opinions because its role is to "'determine real controversies relative to the legal rights of persons and properties which are actually involved in the particular case properly brought before it and to adjudicate those rights in such manner that the determination will be operative, final, and conclusive.'" *State v. Bennett*, 288 Kan. 86, 89, 200 P.3d 455 (2009) (quoting *Board of Johnson County Comm'rs. v. Duffy*, 259 Kan. 500, 504, 912 P.2d 716 [1996]). Mootness—although not a jurisdictional issue—is a doctrine that recognizes that the role of courts is to determine real rather than abstract or hypothetical controversies. *Bennett*, 288 Kan. at 89.

The general test for mootness is whether it is clearly and convincingly shown that the actual controversy has ended. In other words, a case is moot if the only judgment that could be entered would be ineffectual for any purpose and would not impact any of the

7

parties' rights. *State v. Montgomery*, 295 Kan. 837, 840, 286 P.3d 866 (2012). When a criminal defendant dies during the pendency of an appeal, we are only to address issues that "(1) [are] of statewide interest and of the nature that public policy demands a decision, such as those issues that would exonerate the defendant; (2) remain[] a real controversy; or (3) [are] capable of repetition." *State v. Hollister*, 300 Kan. 458, 467, 329 P.3d 1220 (2014).

Tucker's appellate attorney first argues that the Kansas Supreme Court wrongly decided the *Hollister* case. He acknowledges, however, that this court is duty bound to follow precedent from our Supreme Court absent some indication that it intends to depart from its prior position. See *State v. Hall*, 298 Kan. 978, 983, 319 P.3d 506 (2014). Because our Supreme Court has not signaled that it is departing from its holding in *Hollister*, we must follow its holding and determine whether an exception applies that would allow us to consider the merits of Tucker's claim.

The sole assertion made on behalf of Tucker in this appeal is that the district court erred by not finding that he had established justifiable dissatisfaction with Sylvester. If we were to find that the district court abused its discretion by not appointing substitute counsel, the appropriate remedy would be a new trial. See *City of Lawrence v. Jackson*, No. 110,828, 2015 WL 1310152 (Kan. App. 2015) (unpublished opinion) (reversing and remanding for new trial after finding that the district court failed to inquire into the nature of the alleged conflict between the defendant and his attorney); see also *State v. Sharkey*, 299 Kan. 87, 101, 322 P.3d 325 (2014) (reversing and remanding for a new hearing and directing trial judge to conduct a new trial if it found ineffective assistance of trial counsel). Obviously, a new trial in this case would be impossible because of Tucker's death. See *State v. Manns*, No. 111,205, 2015 WL 3514005, at *4 (Kan. App. 2015) (unpublished opinion), *rev. denied* 303 Kan. ___ (February 9, 2016) (dismissing appeal of denial of motion to suppress evidence because the deceased defendant's only available

8

remedy on remand was to grant the motion to suppress rather than find that defendant was innocent).

Moreover, "the decision to grant a criminal defendant new appointed counsel depends heavily upon the circumstances presented in a given case, and *the district court possesses broad discretion in determining whether to appoint new counsel*." (Emphasis added.) *State v. McCormick*, 37 Kan. App. 2d 828, 836, 159 P.3d 194, *rev. denied* 284 Kan. 949 (2007). Given its case-specific nature, the resolution of the issue presented in this appeal would not resolve a matter of public policy. See *Hollister*, 300 Kan. at 467-48 (considering only the deceased defendant's challenge to the sufficiency of the evidence because it was the only issue that could have exonerated him). Thus, we conclude that the first *Hollister* exception does not apply.

Tucker's appellate counsel next suggests a real controversy remains because if the conviction is reversed, the fees associated with the conviction would be vacated— possibly affecting his estate. Of course, there is nothing in the record to indicate whether an estate has been or could be opened. Moreover, as indicated above, even if Tucker were to be successful on the merits, the remedy would not be exoneration but a new trial. It also appears that in *Hollister*, our Supreme Court rejected the notion that the fees imposed in a criminal case preserve a real controversy even upon an appellant's death. See 300 Kan. at 465-66. Indeed, if we accepted the argument that the assessment of fees automatically prevents an appeal from becoming moot upon the death of an appellant, we would eviscerate the holding in *Hollister* because most convicted defendants are assessed fees at sentencing. Therefore, we conclude that Tucker's appeal contains no real controversy. Accordingly, it is moot.

We pause to note that even if Tucker's appeal was not moot, he would not prevail on the merits because the record does not reflect that the district court abused its discretion when it denied his requests for substitute counsel. Although criminal

9

defendants have a constitutional right to representation, that right does not permit them to choose which attorney will represent them. *State v. Brown*, 300 Kan. 565, Syl. ¶ 2, 331 P.3d 797 (2014). To warrant the appointment of substitute counsel, a defendant must demonstrate justifiable dissatisfaction with appointed counsel—which includes a showing of a conflict of interest, an irreconcilable conflict, or a complete breakdown in communications between counsel and the defendant. See *State v. Moyer*, 302 Kan. 892, 360 P.3d 384 (2015).

Once a defendant articulates a statement of attorney dissatisfaction, the district court then must inquire into a potential conflict of interest. *Brown*, 300 Kan. at 575; see *Sharkey*, 299 Kan. at 98 (stating that failing to make an appropriate inquiry is an abuse of discretion). "But ultimately, as long as the trial court has a reasonable basis for believing the attorney-client relationship has not deteriorated to a point where appointed counsel can no longer give effective aid in the fair presentation of a defense, the court is justified in refusing to appoint new counsel." *State v. Sappington*, 285 Kan. 158, Syl. ¶ 5, 169 P.3d 1096 (2007).

The Kansas Supreme Court long ago explained that "[a]n indigent accused has a right to either appointed counsel or pro se representation, but both rights cannot simultaneously be asserted. [Citation omitted.] A defendant who accepts counsel has no right to conduct his own trial or dictate the procedural course of his representation by counsel." *State v. Ames*, 222 Kan. 88, 100, 563 P.2d 1034 (1977). Tucker's unwarranted desire to control Sylvester's representation is evident in his complaint of Sylvester's refusal to adopt Tucker's several meritless pro se motions. As the district court pointed out, Sylvester was ethically precluded from bringing or defending a proceeding on a frivolous basis. See Kansas Rules of Professional Conduct, Rule 3.1 (2015 Kan. Ct. R. Annot. 592). Moreover, Sylvester had the right to exercise his professional judgment in making strategy decisions. See *Pfannenstiel*, 302 Kan. at 767; *State v. Brown*, No. 109,417, 2014 WL 1193422, at *5 (Kan. App. 2014) (unpublished opinion) (finding that

10

defense counsel was not ineffective for not filing a meritless motion to suppress), *rev. denied* 301 Kan. ___ (March 12, 2015).

In a similar case, this court has found that a defendant's desire to control the strategy and tactical decisions of his defense caused the irreconcilable conflict and breakdown in communication alleged by the defendant. *McCormick*, 37 Kan. App. 2d at 838-39. The panel in *McCormick* reminded the defendant that "[w]hile a criminal defendant has the right to consult with appointed counsel and to discuss the general direction of his or her defense, the strategic and tactical decisions are matters for the professional judgment of counsel." 37 Kan. App. 2d at 838 (citing *State v. Bafford*, 255 Kan. 888, 895, 879 P.2d 613 [1994]). Accordingly, it found that a defendant cannot establish justifiable dissatisfaction when the defendant's actions were the cause of the conflict between the defendant and his attorney. 37 Kan. App. 2d at 838-39.

Tucker's appellate counsel also briefly argues that he had a complete breakdown in communications with Sylvester. However, 3 days after the district court denied Tucker's first request for new counsel, Sylvester explained to the district court that the two were "getting along quite well." Sylvester also told the court that he did not think that Tucker trusted any defense counsel or prosecutor to do the right thing, but that they were "seeing probably better eye to eye than most of his other attorneys." Thus, it appears that Tucker and Sylvester did not have a complete breakdown in communication at this point and any breakdown in communication that subsequently occurred, appears to have been the result of Tucker's refusal to permit Sylvester to do his job.

Appeal dismissed.

11